UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>             Plaintiff,         )<br>                                          )<br>    v.                                  )     Case No.  4:21CR344<br>                                          )<br>ANTONIO WILLIAMS,           )<br>             Defendant.       )<br>                                          ) | |

MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

Comes Now the defendant by counsel moves this Court to suppress as evidence a Taurus Millenium G2 seized by the St. Louis City Police Department Detectives, and any statements allegedly made by the defendant to detectives after his arrest. .  As grounds, defendant states:

ALLEGED FACTS

1. On April 29, 2021, Detectives Andrew Kelly and Adam Notch responded to Laurel and Ridge in the Hamilton Heights neighborhood, where a shooting had occurred.  After investigation, the defendant was developed as a possible suspect in this shooting and a description of the car the defendant was driving was input into the database used by the Real Time Crime Center.  An alleged description was  given of a gray newer model Chevrolet Malibu with tinted windows owned by a white female, bearing Missouri License Plate TF3-_ _ _.  (A screenshot of the actual wanted print-out officers used reveals a blue Chevrolet malibu.)  The Real Time Crime Center was able to isolate a Missouri License plate TF3K5Y

1

that matched the description and a wanted was placed out for this car for Assault 1st degree

2. On May 5, 2021 Detectives Kelly and Notch received a notification from Detective Shelton that the wanted Chevrolet Malibu from the case had been picked up by the Real Time Crime Center cameras.  Further notification was given that SLMPD Intelligence Division and SWAT Unit were maintaining surveillance of the car.

3. <u>Before any attempt to stop the car was made</u>, as the vehicle traveled southbound on Kingshighway, PO Benjamin Blackmon, DSN 5646, deployed spike strips in the car's path, spiking the wanted car.    According to observations made by the police, the car fled Southbound on Kingshighway at a high rate of speed. The car was said to have fled through a number of intersections and crashed.  (It is unclear from the police reports when officers engaged in a pursuit of the car with lights and sirens. )

4. According to further observations made by the police, the defendant fled on foot across a parking lot. He was pursued by Detective Saito, Officers Frigerio and Zwillig.  During the foot pursuit, he is alleged to have produced and discarded a Taurus Millenium G2 handgun into an industrial sized garbage dumpster.

5. Detective Kelley interviewed the defendant after his arrest.  The defendant   gave statements about this incident and a shooting incident detectives were investigating. It is unclear as to whether he was ever read his Miranda rights.

## APPLICATION OF LAW

## THE OFFICERS SEIZED ANTONIO WILLIAMS WHEN THEY DEPLOYED SPIKE STRIPS

6. In <u>Torres v. Madrid</u>, the question answered was whether a seizure occurs when an officer shoots someone who temporarily eludes capture.  141 S. Ct. 989 (2021). There, On July 15, 2014, New Mexico State Police Officers executed a search warrant in an apartment complex on a white woman who was accused of white collar crimes but was suspected of being involved with drug trafficking, murder, and other violent crimes. Torres was standing near another person next to a Toyota FJ Cruiser in the parking lot of the apartment complex.  Officer Williamson concluded that neither Torres or her companion were the target of the wanted.  Officer Williamson and Madrid approached the car and attempted to speak to her, but at the time Torres was suffering from methamphetamine withdrawal. She got into the driver's seat of the Toyota and did not notice the officer's presence until they were at her door.  Torres did not recognize the officers and thought they were carjackers attempting to steal her car, she saw only that they had guns. She took off, neither officers were in the path of the fleeing vehicle.  Both officers opened fire to stop her.  Torres was shot twice in the back, temporarily paralyzing her arm. <u>Id</u> at 994

7. Torres sought damages from Officers Williamson and Madrid under 42 USC 1983. She claimed the officers applied excessive force, making the shooting an unreasonable seizure under the 4th Amendment.  Id at 994.  The District Court

3

granted summary judgment and the Court of Appeals of the Tenth Circuit affirmed citing <u>Brooks V. Gaenzle</u>, 614 F.3d 1213, 1233 (10th Cir 2010) "no seizure can occur unless there is physical touch or a show of authority," and that "such physical touch (or force) must terminate the suspect's movement" or otherwise give rise to physical control over the suspect.

8. The Court held citing <u>California v. Hodari D,</u> 499 US 621 (1991) that in fact " an officer's application of physical force to a body of a person for the purpose of arresting him" was in itself an arrest—not an attempted arrest—even if the person did not yield. <u>Id</u> at 995 Specifically the Court held …"the officers' shooting applied physical force to her body and objectively manifested an intent to restrain her from driving away. We therefore conclude that the officers seized Torres the instant the bullets struck her." <u>Id</u> at 999.

9. Here, by analogy, when PO Benjamin Blackmon placed spike strips on Southbound Broadway, he acting with other officers, manifested their intent to restrain the defendant, Antonio Williams, from driving away. By applying force to the car, Officers applied force to the body of the driver. The officers weren't trying to stop a car, they were trying to stop the driver from fleeing, they applied force directly to Mr. Williams in their attempt to stop him from fleeing.

10. "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person." <u>Terry v. Ohio,</u> 392 U.S. 1, 16 (1968). Here again, by analogy, the officers accosted Mr. Williams

4

and restrained his freedom to not walk away but to drive away.  They "seized" him.

## THE SEIZURE OF ANTONIO WILLIAMS WAS IN VIOLATION OF HIS 4TH AMENDMENT RIGHTS

11. The placing of spike strips in the middle of  South Broadway was a <u>Terry</u> stop and was a seizure under the 4th Amendment.  At the time, the unknown driver of the Grey Chevrolet Malibu was not under arrest for a crime, nor was there probable cause to arrest the unknown driver. The car was speculated to have been involved in a shooting that detectives were investigating, an incident that occurred on April 29, 2021.  A description was given to law enforcement of a Grey Chevrolet Malibu with the first three license plate numbers,  TF3-_ _ _,  owned by a white woman.  (It is unclear where this description came from, defense counsel does not have access to these materials.)   The car was entered into the system as  "wanted"  for further investigation to determine if in fact this was the car involved in the shooting and to attempt to locate the shooter.   (Adding confusion, defense counsel received a copy of the screenshot of the wanted, called up from the system, actually used on the date of this incident,and it displays a <u>blue</u> Chevrolet Malibu license TF35KY. The car defendant was driving was silver/gray)

12. In <u>Terry,</u> the Court recognized stops and searches conducted by law enforcement that were not arrests but investigatory in nature. Specifically, in <u>Terry</u>, Officer McFaddon recognized Terry and his companions as engaged in suspicion activity,

5

" casing" a store. Officer McFaddon considered it his duty as a police officer to investigate further, but feared that they might have guns. <u>Id</u> at 5-6. He approached the three men, identified himself as a police officer, and asked them their names. When the men mumbled something, he grabbed Terry, spun him around, and patted down his outer clothing. In the left breast pocket of Terry's overcoat he felt a pistol. Eventually he retrieved the pistol from the overcoat. <u>Id</u> at 7

13. In upholding the search conducted by Officer McFadden, the Court balanced the need to detain and search against the invasion of which the search entails. The Court further provided that any such invasion must be justified by "specific and articulable facts which taken together with rational inferences warrant that intrusion." <u>Id</u> at 21

14. The Court held that Officer McFadden did not violate Terry's Fourth Amendment <u>because the scope of stop and the search itself were not intrusive,</u> when balanced against the need to investigate and for the officer to protect himself. The Court emphasized that "Officer McFaddon did not place his hands inside their pockets or under the outer surfaces until he had felt a weapon, and he merely reached for an removed a gun" <u>Id</u> at 29 (1968)

15. Here, if we apply the balancing test employed in <u>Terry</u>, we are left with a violation of the defendant's Fourth Amendment Rights. This was not a personal encounter between officers and the driver of the vehicle (later determined to be the defendant). It never involved a search. And there may have existed specific

6

and articulable facts to detain Antonio Williams for further investigation, but not an unknown driver of the Grey Chevrolet Malibu.

16. In addition the attempt made to stop the car was intrusive and dangerous given the need to investigate. No attempts were made to alert the car to police presence, either by lights or sirens to pull the car over, or any other means to identify the police as the police.  <u>Spike strips were deployed in the middle of moving traffic, so officers could speak to the driver.</u>  The need to speak to the driver, given the presence of other cars on the road, the risk of a tire blowout causing injury to the driver of the car (afterwards known to be the defendant), and the risk to other vehicles driving or parked in the road, is not outweighed by intrusive nature of the stop and later pursuit,

<u>BECAUSE OF THE ILLEGAL DETENTION, THE SEIZED FIREARM SHOULD BE SUPPRESSED UNDER THE FRUIT OF THE POISONOUS TREE DOCTRINE</u>

17. <u>United States v. Yousif</u>, 308 F.3rd 820 ( 8th Cir 2002) sets out the fruit of the poisonous tree doctrine citing <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963). "Evidence that is the "fruit" of an illegal search or seizure is not admissible and the exclusionary prohibition extends as well to the indirect as the direct products of such invasions"  <u>Yousif</u> at 829 *citing* <u>Wong Sun</u> at 484-485.

18. The controlling question is "whether granting establishment of the primary illegality, the evidence to which an instant objection is made has been come at by

7

exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint. Yousif at 829 *citing* Wong Sun at 488.

19. In United States v. Barber, 557 F.2nd 628 (8th Cir 1977), the Eighth Circuit consolidated two separate appeals by Barber and Keller. The facts surrounding were developed at a joint suppression hearing and at appellant trials. On May 29, 1976, a car with two male and female occupants pulled in front of Baker's Liquor Store in Little Rock, Arkansas. Keller was driving the car, a tan Oldsmobile. Barber was in the passenger front seat. Two women occupied the back seat. Barber went into the liquor store alone. Barber attempted to purchase a half gallon of Canadian whiskey and a pint of vodka, with a one-hundred dollar bill, which he presented to the store proprietor, Mr. Baker. Id at 629

20. Mr. Baker became suspicious of the bill as it appeared excessively white. Mr. Baker retired to the back room of the store, which served as a room and his private apartment. Present in that room were a number of his friends, including United States Secret Service Agents Haldeman and Sparks, and Little Rock Police Detective Knestrict. The Agents determined the bill to be counterfeit, and Barber was subsequently arrested inside the store. Id

21. The Officers then went directly to the awaiting car, where they arrested Keller and the two women occupants. Barber and Keller were placed in the back of a squad car and driven to the police station. Officer Andrews, who was driving the squad car, noticed movements in the back. Officer Andrews observed Keller bring a white piece of paper from his right side to his left side. After Andrews had taken the suspect into the station, a search of the car revealed a white folded envelope

8

under the back seat which contained eleven counterfeit notes similar to the one passed in the store. Id at 630.

22. Count I charged all four defendants with passing the note in Baker Liquor Store, Count II charged Keller with possession of the eleven counterfeit $100 bills found in the squad car. Barber was convicted on Count I, and Keller was convicted on Counts I and II. Id

23. Keller appealed the District Court judgment refusing to suppress the eleven notes found by Officer Andrews under the seat. Id  The Eighth Circuit found that Keller's arrest was illegal, that his arrest appeared to be from the mere association with Barber and his mere presence in the car. Id at 632  The Court reasoned that "It follows from the illegality of Keller's arrest that the eleven notes secreted in the backseat of the police car should have been suppressed as the fruits thereof. " Id at 632

24. The Court supported their opinion by citing Fletcher v. Wainwright, 399 F. 2d, 62 (5th Cir. 1968). In Fletcher, the police officers used force to illegally enter a motel room. Their entry prompted the occupants to throw certain items of stolen jewelry out the window.  Officers found these items shortly thereafter. The Court in Wainwright refused to find the property had been abandoned, ruling instead that "since the initial entry was improper and the items were thrown out the window as a direct result of that illegality, the police were not entitled to the fruits." Id at 632 *citing* Wainwright at 64.

25. Here, given the initial detention of the defendant was illegal.  The fruits of illegal detention ought to be suppressed.  The deployment of the spike strips, caused the

9

defendant to flee and abandon the firearm into a trash dumpster. These actions were a direct result of Officer Benjamin Blackmon placing the spike strips in the middle of southbound Kingshighway coupled with later pursuit. . But for spike stripping the car, and later pursuing him, the gun would never have been abandoned. And there is no independent method by which this evidence might have been retrieved. Defendant is in the position of those individuals in <u>Barber</u> and <u>Wainwright</u>. In both cases, the Court found that the taint of the illegal detention had not been attenuated or purged by the subsequent abandonment of the property. Here, like in those cases, the weapon found by officers in the trash dumpster ought to be suppressed.

26. Any statements given by the defendant should be suppressed using the same rationale. Also, it is unclear whether the defendant was read his Miranda rights after being taken into custody.

WHEREFORE, the defendant moves this Court to suppress as evidence any gun seized by law enforcement, any testimony concerning items seized as a result of the search complained of herein, any statements made by the defendant while in police custody, and for a hearing and for such other relief as this Court deems just.

Respectfully submitted,

/s/Robert Taaffe Jr.
Robert P. Taaffe Jr. MO49537
Attorney for Defendant
1015 Locust, Suite 1032
St. Louis, MO 63101
314-241-3700
314-241-3710 fax

10

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was electronically filed on this 13th day of June, 2023 giving notice to all relevant parties.

/s/ Robert P. Taaffe J