UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>        Plaintiff, )<br> )<br>v. )<br> )<br>ANTONIO WILLIAMS, )<br>        Defendant. )<br> ) | Case No.  4:21CR344 |

### DEFENDANT'S POST-HEARING PRE-TRIAL MOTIONS BRIEF

### FACTS

On April 29, 2021, Detectives Andrew Kelly and Adam Notch responded to Laurel and Ridge in the Hamilton Heights neighborhood, where a shooting had occurred. TR 6-14. After investigation, the Defendant was developed as a possible suspect in this shooting and a description of the car the defendant was driving was input into the database used by the Real Time Crime Center.  A description was  given of a "dark blue, kind of grayish" newer model Chevrolet Malibu with tinted windows owned by a white female, bearing Missouri License Plate TF3-_ _ _. TR 12 6-13;   The Real Time Crime Center was able to isolate a Missouri License plate TF3K5Y that matched the description and a wanted was placed out for this car for Assault 1st degree. TR 17 1-15.

On May 5, 2021 Detectives Kelly and Notch received a notification that the wanted Chevrolet Malibu from the case had been picked up by the Real Time Crime Center cameras. TR 21 18-21. Further notification was given that SLMPD Intelligence Division and SWAT Unit were maintaining surveillance of the car. Id.

At the evidentiary hearing Officer Steven Saito testified that, <u>before any attempt to stop the car was made</u>, as the vehicle traveled southbound on Kingshighway, SLMPD officers deployed spike strips in the car's path, spiking the wanted car. TR 52 22-25.  According to observations made by the police, the car fled southbound on Kingshighway at a high rate of speed. The car was said to have fled through a number of intersections and crashed.  TR 53 4, TR 55 21.

According to Officer Saito, the Defendant fled on foot across a parking lot. TR 56 5-16. He was pursued by Detective Saito, Officers Frigerio and Zwillig. Id.  During the foot pursuit, the Defendant is alleged to have produced and discarded a pistol into an industrial sized garbage dumpster. 56 13-16

Detective Kelley interviewed the defendant after his arrest.  The defendant   gave statements about this incident and a shooting incident detectives were investigating. It is unclear as to whether he was ever read his Miranda rights.

<u>APPLICATION OF LAW</u>

<u>THE OFFICERS SEIZED ANOTONIO WILLIAMS WHEN THEY DEPLOYED SPIKE STRIPS</u>

In <u>Torres v. Madrid</u>, the question answered was whether a seizure occurs when an officer shoots someone who temporarily eludes capture.   141 S. Ct. 989 (2021).  There, On July 15, 2014, New Mexico State Police Officers executed a search warrant in an apartment complex on a white woman who was accused of white collar crimes but was suspected of being involved with drug trafficking, murder, and other violent crimes. Torres was standing near another person next

to a Toyota FJ Cruiser in the parking lot of the apartment complex.  Officer Williamson concluded that neither Torres or her companion were the target of the wanted.  Officer Williamson and Madrid approached the car and attempted to speak to her, but at the time Torres was suffering from methamphetamine withdrawal. She got into the driver's seat of the Toyota and did not notice the officer's presence until they were at her door.  Torres did not recognize the officers and thought they were carjackers attempting to steal her car, she saw only that they had guns. She took off, neither officers were in the path of the fleeing vehicle.  Both officers opened fire to stop her.  Torres was shot twice in the back, temporarily paralyzing her arm. Id at 994

Torres sought damages from Officers Williamson and Madrid under 42 USC Section 1983. She claimed the officers applied excessive force, making the shooting an unreasonable seizure under the 4th Amendment.  Id at 994.  The District Court granted summary judgment and the Court of Appeals of the Tenth Circuit affirmed citing Brooks V. Gaenzle, 614 F.3d 1213, 1233 (10th Cir 2010) "no seizure can occur unless there is physical touch or a show of authority," and that "such physical touch (or force) must terminate the suspect's movement" or otherwise give rise to physical control over the suspect.

The Court held citing California v. Hodari D, 499 US 621 (1991)  that in fact " an officer's application of physical force to a body of a person for the purpose of arresting him" was in itself an arrest—not an attempted arrest—even if the person did not yield. Id at 995 Specifically the Court held …"the officers' shooting applied physical force to her body and objectively manifested an intent to restrain her from driving away.  We therefore conclude that the officers seized Torres the instant the bullets struck her." Id at 999.

In <u>Steed v. Missouri State Highway Patrol,</u> Steed through his next friend, Toya Steed filed a suit under 42 USC Section 1983. 2 F.4th 767 (8th Cir 2021).  In this case, Jerome Goode led police on a twenty-five mile high speed chase that ended in his death and the deaths of passengers, Lavoy Steed (petitioner), and Leon Haywood.  Presaida Hays survived.  <u>Steed</u> at 769. In <u>Steed</u>, Troopy Ashby deployed spike strips to attempt to stop the Ford Explorer that Jerome Good was driving.  <u>Id</u> at 769  But Goode drove around the spike strips and continued to flee.  In upholding summary judgment at the district court level, the Eighth Circuit held citing <u>Torres</u>, that the failed attempt to restrain a suspect is not a "seizure" within the meaning of the Fourth Amendment unless there is some application of physical force. <u>Id</u> at 770, *Citing* <u>Torres</u> at 989.

Here, by reasoning and inference, Detectives Saito et. al  manifested their intent to restrain the defendant from driving away when the deployed spike strips on southbound Kingshighway. TR 52 22-25. Detective Saito states that this was with the purpose of impeding the vehicles ability to flee. TR 51 25 - 52 1-4. In <u>Steed,</u> the Eight Circuit implicitly recognised in its holding that the deployment of spike strips or the application of physical force by an officer to restrain the defendant is a "seizure" under the Fourth Amendment. Therefore, given that officers deployed spike strips and successfully deflated the tires, Mr. Williams was seized by the officers.

<u>THE SEIZURE OF ANONIO WILLIAMS WAS IN VIOLATION OF HIS 4TH AMENDMENT RIGHTS UNDER TERRY V. OHIO</u>

The facts at hand could lend themselves to the conclusion that this was an investigative stop considering the purpose of the "fugitive apprehension strike force" , the fact that the officers

were searching for Mr. Williams personally, and the subsequent deployment of spike strips. An investigative stop is constitutional if it meets the requirements of Terry v. Ohio, 392 US 1 (1968)

In Terry, the Court recognized stops and searches conducted by law enforcement that were not arrests but investigatory in nature. Specifically, in Terry, Officer McFaddon recognized Terry and his companions as engaged in suspicion activity, " casing" a store. Officer McFaddon considered it his duty as a police officer to investigate further, but feared that they might have guns. Id at 5-6. He approached the three men, identified himself as a police officer, and asked them their names. When the men mumbled something, he grabbed Terry, spun him around, and patted down his outer clothing. In the left breast pocket of Terry's overcoat he felt a pistol. Eventually he retrieved the pistol from the overcoat. Id at 7

In upholding the search conducted by Officer McFadden, the Court balanced the need to detain and search against the invasion of which the search entails. The Court further provided that any such invasion must be justified by "specific and articulable facts which taken together with rational inferences warrant that intrusion." Id at 21

The Court held that Officer McFadden did not violate Terry's Fourth Amendment because the scope of stop and search itself were not intrusive, when balanced against the need to investigate and for the officer to protect himself. The Court emphasized that "Officer McFaddon did not place his hands inside their pockets or under the outer surfaces until he had felt a weapon, and he merely reached for and removed a gun" Id at 29 (1968).

Here, it is impossible to conclude that this stop was permissible under Terry in that the purpose of the stop clearly was to apprehend Mr. Williams. The police had put Mr. Williams in

their database as "wanted", they had a vague description of the car in question, and–though, importantly, they had no probable cause to believe the individual driving the car was Mr. Williams–it was clearly their intention to find out if it was him regardless.

Furthermore, even if one were inclined to interpret the intention behind the stop as permissible under Terry, the method the police employed to stop Mr. Williams was literally intrusive in that they spiked and deflated the tires of the car. It strains credulity to think that spike stripping a moving car in daytime traffic without even turning on emergency lights counts as unintrusive. Therefore, the method of stopping Mr. Williams is indefensible under Terry and thus illegal.

## THE EMPLOYMENT OF SPIKE STRIPS WAS AN ARREST WITHOUT PROBABLE CAUSE

In Childers, Victor Childes conditionally plead guilty to being a felon in possession of a firearm and ammunition.  His conditional plea preserved his right to appeal the denial of his motion to suppress the ammunition from his person and the firearms recovered from his vehicle. United State of America v. Childers, No. 22-2734 (8th Circuit 2023).  The issue was whether or not the high-risk felony protocol stop transformed a Terry stop into an arrest.

In Childers, Burnsville, Minnesota police officers received a report of gunfire near Riverfront Park.. The call reported that three males, two described as black and one as lighter-skinned, were shooting into the river.  Id at 2.  A separate call described the shooter as a "white male" in his twenties wearing a black shirt.  Id

Upon arrival, an officer noticed three individuals matching the description given in the first report.  The three men were leaving the wooded area and walking to their car.  The men entered a silver car parked in the parking lot.  Officers then followed protocol for "high-risk felony stop".  Burnsville officers use this protocol if they believe firearms are involved and may pose a risk to officers.  Id.

Officers approached the car with guns drawn and ordered the men out of the vehicle one by one. Id at 3.  Childers exited the vehicle and was handcuffed. The other two occupants were removed from the car and handcuffed.  Following the protocol each of the three men were placed in separate cars.  Id

Officer's next informed Childer's that they were going to pat him down.  During the pat down the officer felt what he believed were bullets in his right-front pocket. After Childers emptied his pockets the officer found bullets wrapped up inside a bandana.  The officers then conducted a protective sweep of the car and within two minutes located the first of two handguns under the driver's seat where Childers had been sitting. Id.

The Eighth Circuit considered five factors in determining whether a Terry stop has transformed into an arrest:

> (1) the number of officers and police cars involved; (2) the nature of the crime and whether there is reason to believe the suspect might be armed; (3) the strength of the officers articulable, objective suspicions; (4) the erratic erratic behavior of or suspicious movements by the persons under observation; and (5) the need for immediate action by officers and the lack of opportunity for them to have made

the stop in less threatening circumstances.  Id at 4, citing United State v. Johnson, 31 F. 4th 618, 623 (8th Cir. 2022) (quoting Pollrete v. Marzolf, 9 F. 4th 737, 745 (8th Cir 2021))

Applying these factors to the circumstances surrounding Childers' encounter, the Court held that the first and second factors weighed in favor of the government; seven police officers in three separate cars did not display an excessive police presence.  The nature of the crime elevated police concerns of officer and public safety.  The third factor was found to weigh in favor of the government because of the reported identifications made by eyewitnesses.  The fourth factor weighed in no one's favor, because Childers initially talked back to offices but then compiled. The fifth factor weighed in favor of the government because the officers observed the three individuals matching the reported description exiting the woods and entering a car given rise to obvious need for immediate action.  Id at 5

Here, the government would lose the five factor test.  The government would lose the first factor as as multiple officers, both present and remote, as well as "several SWAT vehicles", were surveilling the car.  The government would win the second factor because the nature of the crime was violent, and there is at least some reason to believe that the driver was armed.  The third factor is a toss up,  the officers did have a wanted associated with the car in question but it was not clear who was driving the car nor whether it was the right color. This is hardly an objective articulable observation that the Defendant in fact was driving it.  The government would lose the fourth factor because at no point during their protracted surveillance did the police observe the Defendant behave erratically or dangerously. Furthermore, the police spike stripped the car before even making their presence known. The defendant did drive off when his

car was spiked, but that was subsequent to the invasive measure of spiking the car.  The fifth factor the government would lose because there was no need for immediate action to determine if the individual driving the car was the Defendant. In fact, the police had followed the suspect car for quite a distance and it is unclear from the record why the car was spiked at that time. The police could have simply initiated a traffic stop in a traditional fashion. They could have turned on its full sirens and followed the car the defendant drove down Kingshighway.  If the Defendant resisted the traffic stop, then the police might have escalated methods of stopping the Defendant then. Therefore, taking all the Childers factors into consideration, the use of spike strips in this case amounted to an arrest without probable cause, and was therefore illegal.

## BECAUSE OF THE ILLEGAL DETENTION, THE SEIZED FIREARM SHOULD BE SUPPRESSED UNDER THE FRUIT OF THE POISONOUS TREE DOCTRINE

### The Abandonment Doctrine Does Not Apply

United States v. Yousif, 308 F.3rd 820 ( 8th Cir 2002) sets out the fruit of the poisonous tree doctrine citing Wong Sun v. United States, 371 U.S. 471 (1963). "Evidence that is the "fruit" of an illegal search or seizure is not admissible and the exclusionary prohibition extends as well to the indirect as the direct products of such invasions" Yousif at 829 *citing* Wong Sun at 484-485.

The controlling question is "whether granting establishment of the primary illegality, the evidence to which an instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint. Yousif at 829 *citin*g Wong Sun at 488.

In <u>United States v. Barber</u>, 557 F.2nd 628 (8th Cir 1977), the Eighth Circuit consolidated two separate appeals by Barber and Keller. The facts surrounding were developed at a joint suppression hearing and at appellant trials. On May 29, 1976, a car with two male and female occupants pulled in front of Baker's Liquor Store in Little Rock, Arkansas. Keller was driving the car, a tan Oldsmobile.  Barber was in the passenger front seat.  Two women occupied the back seat. Barber went into the liquor store alone.  Barber attempted to purchase a half gallon of Canadian whiskey and a pint of vodka, with a one-hundred dollar bill, which he presented to the store proprietor, Mr. Baker. <u>Id</u> at 629

Mr. Baker became suspicious of the bill as it appeared excessively white.  Mr. Baker retired to the back room of the store, which served as a room and his private apartment. Present in that room were a number of his friends, including United States Secret Service Agents Haldeman and Sparks, and Little Rock Police Detective Knestrict.  The Agents determined the bill to be counterfeit, and Barber was subsequently arrested inside the store.  <u>Id</u>

The Officers then went directly to the awaiting car, where they arrested Keller and the two women occupants.  Barber and Keller were placed in the back of a squad car and driven to the police station.  Officer Andrews, who was driving the squad car, noticed movements in the back. Officer Andrews observed Keller bring a white piece of paper from his right side to his left side.  After Andrews had taken the suspect into the station, a search of the car revealed a white folded envelope under the back seat which contained eleven counterfeit notes similar to the one passed in the store.  <u>Id</u> at 630.

Count I charged all four defendants with passing the note in Baker Liquor Store, Count II charged Keller with possession of the eleven counterfeit $100 bills found in the squad car. Barber was convicted on Count I, and Keller was convicted on Counts I and II.  Id

Keller appealed the District Court judgment refusing to suppress the eleven notes found by Officer Andrews under the seat.  Id  The Eighth Circuit found that Keller's arrest was illegal, that his arrest appeared to be from the mere association with Barber and his mere presence in the car. Id at 632  The Court reasoned that "It follows from the illegality of Keller's arrest that the eleven notes secreted in the backseat of the police car should have been suppressed as the fruits thereof. " Id at 632

The Court supported their opinion by citing Fletcher v. Wainwright, 399 F. 2d, 62 (5th Cir. 1968). In Fletcher, the police officers used force to illegally enter a motel room. Their entry prompted the occupants to throw certain items of stolen jewelry out the window.  Officers found these items shortly thereafter. The Court in Wainwright refused to find the property had been abandoned, ruling instead that "since the initial entry was improper and the items were thrown out the window as a direct result of that illegality, the police were not entitled to the fruits." Id at 632 *citing* Wainwright at 64.

Here, given the initial detention of the defendant was illegal, the fruits of illegal detention ought to be suppressed.  The deployment of spike strips was an arrest without probable cause, and caused the defendant to flee the illegal stop and abandon the firearm in a dumpster.  These actions were a direct result of the actions taken by SLMPD officers. But for spike stripping the car, and later pursuing Mr. Williams on foot, the gun would never have been abandoned. And there is no independent method by which this evidence might have been retrieved.  Defendant is

in the position of those individuals in <u>Barber</u> and <u>Wainwright</u>.  In both cases, the Court found that the taint of the illegal detention had not been attenuated or purged by the subsequent abandonment of the property.  Here, like in those cases, the weapon found in the dumpster ought to be suppressed.

        Respectfully submitted,

        /s/Robert Taaffe Jr.
Robert P. Taaffe Jr. MO49537
Attorney for Defendant
1015 Locust, Suite 1032
St. Louis, MO  63101
314-241-3700
314-241-3710 fax

CERTIFICATE OF SERVICE

    The undersigned hereby certifies that a true and accurate copy of the foregoing was electronically filed on this 28th  day of September , 2023 giving notice to all relevant parties.

        /s/ Robert P. Taaffe J