UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause 4:21CR344 MTS (SPM) |
| | ) |
| ANTONIO LENARR WILIAMS | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

In accordance with the Memorandum Opinion filed herewith,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements (Doc. 51) be **DENIED.**

The parties are advised that they have **fourteen (14)** days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Trial in this case will be set on **January 22, 2024** before the Honorable Matthew T. Schelp.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of October, 2023.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Cause 4:21CR344 MTS (SPM) |
| ) | |
| ) | |
| ANTONIO LENARR WILIAMS ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). Defendant Antonio Lenarr Williams ("Defendant" or "Williams") is charged in an indictment with being a felon in possession of a firearm. The charge stems from Williams' arrest on May 5, 2021, by members of the St. Louis Metropolitan Police Department. At the time of his arrest Williams and the car he was driving were listed in a police database as "wanted" in connection with an Assault 1st felony investigation. Before attempting to conduct a traffic stop of Williams, police successfully spiked the tires of Williams' car, causing the tires to deflate. Police then pursued Williams both in the car and on foot before apprehending him. During the foot pursuit, an officer saw Williams throw a gun into a dumpster. After Williams was apprehended, the officer found the gun in the dumpster and seized it as evidence.

Williams has filed a motion to suppress the gun and any statements he made contending, in essence, that the officers' successful use of a spike strip on his vehicle was an unconstitutional seizure in violation of the Fourth Amendment. (Docs. 51 & 64). The United States has opposed the motion arguing that the use of the spike strips to disable Williams' car did not constitute a

seizure under the Fourth Amendment. In the alternative, the United States argues that, even if use of the spike strips was a seizure, Williams' motion fails because the seizure was supported by reasonable suspicion and/or probable cause. (Docs. 53 & 63).

The undersigned held an evidentiary hearing on July 6, 2023. At the hearing, former St. Louis Metropolitan Police Department (SLMPD) Detective Adam Notch and Detective Steven Saito testified on behalf of the United States. The United States also introduced evidence including a disc of Williams' recorded interview following his arrest, photographs from the scene at the time of the arrest, and video and audio recordings of the car pursuit. *See* Govt. Exhs. 1-6. Williams did not offer any evidence or witnesses but cross examined the United States' witnesses. At the conclusion of the hearing, the parties were granted additional time in which to file post-hearing briefs. Post-hearing briefing concluded on October 2, 2023, and the matter is now ready for ruling. (Docs. 63-65).

After carefully considering the evidence presented at the hearing and the arguments and information provided in the parties' written submissions, the undersigned makes the following findings of fact and conclusions of law.

## **FINDINGS OF FACT**

### A. *Investigation of Williams*

On April 29, 2021, former SLMPD Detective Adam Notch and his partner, Detective Andy Kelley, responded to a shooting at 1447 Hamilton. At the scene, they found evidence of gunfire from multiple firearms. Based on his on-scene investigation, Det. Notch identified Williams' younger brother (also named Antonio Williams) as a person involved in the shooting. Based on his investigation, Det. Notch determined the younger Williams was both a suspect and possibly a victim. As such, Det. Notch interviewed the younger Williams.

2

The younger Williams told Det. Notch he and his brother were feuding over a woman and the feud had turned violent during the week. The younger Williams told Det. Notch that on April 29th Defendant shot at him from a vehicle as he was leaving the residence. The younger Williams also said that on two separate occasions earlier that same week, Defendant had fired shots at him from the same vehicle in two separate locations. The younger Williams described the time and locations of the shootings and described the car his brother was driving as a "grayish" "blue" newer Malibu, indicating it was owned by a white girl. The younger Williams also told Det. Notch that his brother had been sending threatening text messages and shared the text messages with Det. Notch.

Some days after the initial investigation, the younger Williams went to the police station looking for Det. Notch. The younger Williams indicated he feared for his safety given the ongoing feud with Williams and asked Det. Notch to lock him up (the younger Williams) for his own safety. Det. Notch sought emergency charges against the younger Williams from the St. Louis Circuit Attorney's Office but was told to put the application in a drop box with other cases pending review. Det. Notch was told there was no known review date; so, he turned his attention to trying to further identify the suspect vehicle Williams was allegedly driving when he shot at his younger brother.

Det. Notch explained that the SLMPD had Real Time Crime Center cameras that operate in the area. Based on information provided by officers investigating crimes, officers working in the Real Time Crime Centers can review camera footage and try to isolate vehicles based on vehicle description and reported locations of those vehicles during the relevant time frame. Det. Notch testified that there are Real Time Crime Centers near each of the locations of the three shootings described by the younger Williams. Det. Notch shared information from his

3

investigation with other officers including officers at the Real Time Crime Center. Sometime after the shooting on April 29th, an officer at the Real Time Crime Center provided Det. Notch with a partial license plate for the vehicle allegedly driven by Defendant during the shootings.

Det. Notch subsequently learned the Real Time Crime Center was able to determine the full license plate number on the vehicle described by the younger Williams. On May 5, 2021, Det. Andy Kelley entered the vehicle described by the younger Williams as "wanted" in a police database. In entering the car into the police database, Det. Kelley described the vehicle as a blue Chevy Malibu with license plate number TF3K5Y and stated it was "wanted" in connection with an Assault 1st on April 29, 2021.

### B. *Officers' Pursuit of Williams and the Wanted Malibu*

On May 5, 2021, SLMPD Detective Steven Saito was working with the SLPMD Fugitive Apprehension Strike Team (the "Strike Team"). Det. Saito explained that the Real Time Crime Center has access to various cameras throughout the city, including license plate recognition cameras. When a vehicle listed as stolen or wanted for a violent crime passes one of these license plate recognition cameras, the Real Time Crime Center is alerted and they, in turn, notify officers where the vehicle is located and the direction in which it is traveling.

Approximately one hour after Det. Kelley entered the Chevy Malibu in the police database as "wanted" Det. Saito and other members of the Strike Team were notified by the Real Time Crime Center that the Malibu was on the road. Det. Saito and other members of the Strike Team communicated via recorded radio transmissions to locate, monitor, and strategize about conducting a traffic stop of the Malibu. When Det. Saito and the Strike Team first started monitoring the Malibu, they discussed their collective understanding that the driver of the Malibu was wanted in connection with a recent shooting, and the Malibu had been used in that

4

shooting. Based on recorded radio transmissions it appears officers on the Strike Team were made aware that the suspect vehicle was wanted for Assault 1st Degree, and that Det. Kelley, who was investigating the case, predicted "it's definitely gonna flee. . . this guy's been trying to shoot his brother for the past couple weeks, and has shot at him." *See* Govt. Exh. 3, (00:40-1:00). Officers on the Strike Team were also made aware that the wanted suspect was Antonio Williams, a convicted felon. *Id.* (02:15-02:30).

While the Strike Team was monitoring the Malibu, it traveled outside city limits into St. Louis County. Although the Strike Team followed the Malibu into the county, they decided they would not attempt to stop the Malibu until it came back into the city. While the Malibu was in St. Louis County, members of the Strike Team were able to observe the driver when he stopped at a store and got out of the Malibu. The Strike Team Members who observed the driver described him over the radio transmission to other officers, including Det. Saito, who testified the description provided matched Williams' description. At one point, Det. Notch joined the radio channel and spoke directly with members of the Strike Team, confirming that Williams had long dreadlocks.

The Strike Team decided to spike the Malibu's tires before activating lights and sirens to conduct a traffic stop. Det. Saito, who had been with the SLMPD for over twelve years, explained that the decision to use spike strips was based on the nature of the crime Williams was suspected of and out of concern that Williams may endanger other motorists and bystanders by attempting to flee at a high rate of speed. Det. Saito also explained that the spike strips used by the Strike Team were a "hollow spike" that "slowly lets the air out" of a tire; as such, the spikes were not intended to result in immediate deflation of the tires. Doc. 61 (Hearing Tr.), p. 78.

5

Eventually, the Malibu re-entered the city limits and Det. Saito observed the Malibu traveling southbound on Kingshighway. The Malibu came to a stop at the intersection of Kingshighway and Natural Bridge. When the light turned green for southbound Kingshighway traffic, an SLMPD SWAT officer deployed spike strips. After the tires of the Malibu were spiked, Williams accelerated. Members of the Strike Team activated their lights and sirens shortly after the Malibu's tires were spiked.

The Malibu could not travel very fast because of the deflating tires. However, Det. Saito observed the Malibu engage in erratic and dangerous driving on a major thoroughfare through relatively heavy traffic in the middle of the day. For example, Det. Saito saw the Malibu drive through busy intersections the wrong way, drive southbound on Kingshighway in the northbound lanes, and swerve dangerously around other cars. The vehicle pursuit ended when the Malibu crashed into another vehicle near the intersection of Lindell Boulevard and Kingshighway. Most of the vehicle pursuit was captured by video recordings from a camera on a Strike Team Member's vehicle.

After the accident, Williams jumped out of the Malibu and attempted to flee on foot. Det. Saito and other officers chased him. During the foot pursuit, Det. Saito saw Williams throw a pistol into a dumpster and continue fleeing. Williams was apprehended a short distance from the dumpster and taken into custody. Det. Saito returned to the dumpster and retrieved the gun. He reported via radio transmission that he had seized evidence and read the serial number of the firearm over the radio.

### C. Williams' Post-arrest Interview

Williams was transported to the police station after his arrest. At the station, Det. Notch conducted an audio and video recorded interview of Williams. *See* Govt. Exh. 2. Before

interviewing Williams, Det. Notch read Williams his *Miranda* rights from a card. Williams acknowledged his rights and submitted to the interview. When asked about the gun recovered from the dumpster, Williams denied it belonged to him. During the interview, no threats or promises were made to Williams.

## CONCLUSIONS OF LAW

Williams argues the gun seized by police should be suppressed because it was the fruit of an unconstitutional seizure that began when officers successfully spiked the tires of the Malibu he was driving. Williams also argues, for the same reasons, any statements he made following this unconstitutional seizure should be suppressed. The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment may not be introduced at trial to prove a defendant's guilt. *Elkins v. United States,* 364 U.S. 206, 223-24 (1960) (evidence obtained as the result of an unreasonable search and seizure by state officers cannot be used against defendant in federal court). The exclusionary rule applies to verbal statements obtained because of official misconduct as well as to the more traditional seizure of physical evidence. *United States v. Yousif,* 308 F.3d 820, 832 (8th Cir. 2002) ("Verbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search.").

Williams posits he was first seized under the Fourth Amendment when he drove over the spike strips at the intersection of Kingshighway and Natural Bridge. Williams asserts this seizure violated the Fourth Amendment in two ways. First, Williams argues officers lacked probable cause or reasonable suspicion of criminal activity when they seized him. Second, Williams argues that the method police used to seize him—use of spike strips—violated the Fourth Amendment because spiking the Malibu's tires was dangerous and objectively unreasonable under the circumstances.

7

### A. The Strike Team had reasonable suspicion, if not probable cause, to detain Williams and the Malibu.

The foregoing factual findings establish that Det. Saito and the Strike Team decided to conduct a traffic stop of the Malibu after they were alerted that it was "wanted" and in the area. "[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). In addition, "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *United States v. Hensley*, 469 U.S. 221, 229 (1985). In determining whether a police officer had reasonable suspicion of criminal activity, the court must consider the "totality of the circumstances as 'understood by those versed in the field of law enforcement.'" *United States v. Gray*, 213 F.3d 998, 1000 (8th Cir. 2000) (quoting *United States v. Cortez,* 449 U.S. 411, 418 (1981)).

An officer's reasonable, articulable suspicion need not be based solely on the personal knowledge of the arresting officer. Rather, so long as there is some degree of communication between the investigating officers, an officer's reasonable, articulable suspicion may be predicated on information provided by other law enforcement officers as well as the officer's own observations. In *United States v. Hensley,* 469 U.S. 221, 232 (1985), the Supreme Court held that, when making an investigatory *Terry* stop, police officers may rely upon notice from another police department that a person is wanted in connection with the investigation of a felony, even if the notice omits the specific articulable facts supporting reasonable suspicion. *See also Smith,* 648 F.3d at 659. "[I]f a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer

8

or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information." *Hensley,* 469 U.S. at 232 (internal citations omitted). *Accord Smith,* 648 F.3d. at 659 (quoting *Hensley,* 469 U.S. at 232). *See also United States v. Farnell*, 701 F.3d 256, 262 (8th Cir. 2012) (holding that an officer's reliance on a police bulletin, coupled with defendant's physical appearance and location, provided an objectively reasonable basis for a *Terry* stop even though officer's observation of the person was brief and from a distance and there had been no traffic violations or other independent reason to stop the vehicle); *United States v. Robinson*, 664 F.3d 701, 703 (8th Cir. 2011) (recognizing that "'[w]hen multiple officers are involved in an investigation, probable cause may be based on their collective knowledge and need not be based solely on the information within the knowledge of the arresting officer as long as there is some degree of communication'") (quoting *United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011)).

  Here, the decision of the Strike Team to initiate a traffic stop of Williams and to deploy spike strips was based on the collective knowledge of the investigating detectives—Notch and Kelley—and members of the Strike Team, including Det. Saito. The factual findings demonstrate that Det. Notch and Det. Kelley gleaned firsthand knowledge about the shootings when they responded to 1447 Hamilton on April 29th and investigated the scene. Det. Notch learned further details about risks Defendant posed to the younger Williams when he interviewed the younger Williams on April 29th and then again several days later when the younger Williams returned to the police station asking to be taken into custody for his own protection.

  The evidence presented at the hearing further established that the investigating officers shared what they knew about Williams, the Malibu, and the shootings with other officers, including officers at the Real Time Crime Center and Members of the Strike Team. For

9

example, the testimony of Det. Saito and the recorded radio transmissions demonstrate that, while they were surveilling the Malibu, the Strike Team had information from the investigating officers, Notch and Kelley, about the shootings, about the owner of the Malibu, and about Williams' appearance and status as a convicted felon. The radio transmissions also demonstrate the detectives who investigated the shooting, Notch and Kelley, were in direct communication with members of the Strike Team. At one point, Det. Notch joined the radio channel and spoke directly with members of the Strike Team, confirming that Williams had long dreadlocks. Finally, the evidence of record established that when the Strike Team followed the Malibu into St. Louis County, members of the Strike Team were able to observe the driver of the Malibu when he got out of the car. Based on a discussion over the radio with other members of the Strike Team, including Det. Notch, they confirmed the driver of the Malibu fit Williams' description.

In sum, evidence presented at the hearing established that before police deployed spike strips on the Malibu, the officers involved collectively had sufficient reasonable suspicion, if not probable cause, based on specific, articulable facts that Williams was driving the Malibu and had completed more than one violent felony offense.

### B.  *The use of spike strips was not unreasonable under the circumstances*.

The factual findings demonstrate that the Strike Team decided to spike the tires of the Malibu before they activated lights and sirens to conduct the traffic stop. This decision was based on information from the investigating detectives that Williams was likely to flee, had been trying to shoot his brother for the past couple weeks, and had shot at him. Det. Saito testified that the type of spikes used were not designed to immediately disable a car by instantly deflating its tires. Instead, the officers used spikes that were designed to slowly deflate the tires with the intention of

10

guarding against the risk that Williams might try to lead them on a dangerous high-speed chase through heavily populated parts of St. Louis City.

In conducting an investigatory *Terry*-type stop, "[o]fficers must 'use the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the *Terry* stop.'" *United States v. Newell,* 596 F.3d 876, 879 (8th Cir. 2010) (quoting *Terry,* 392 U.S. at 25-31). When assessing the manner through which a seizure is effected, a court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Scott v. Harris*, 550 U.S. 372, 383 (2007) (internal quotations omitted). "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The test is whether the amount of force was objectively reasonable under the circumstances. *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009). At least one Circuit Court of Appeals has held that the use of tire deflation devices weigh in favor of the government's interest in public safety when balanced against their minimal intrusiveness. *See United States v. Guzman-Padilla*, 573 F.3d 865, 887-89 (9th Cir. 2009).

Based on the record before the Court, the use of spike strips was not overly intrusive or unreasonably dangerous given the circumstances. Instead, the record demonstrates the use of the spike strips was justified and reasonable under the Fourth Amendment based on information available to the officers in the moment.

### C. *Williams was not seized for Fourth Amendment purposes when he drove over the spike strips.*

Williams argues that, even though he did not yield to police, he was seized under the Fourth Amendment the moment he drove over the spike strips at the intersection of Kingshighway and

11

Natural Bridge. Williams cites the Supreme Court's decision in *Torres v. Madrid,* 592 U.S. ___, 141 S. Ct. 989, 995 (2021) and the Eighth Circuit's decision in *Steed v. Missouri State Highway Patrol,* 2 F.4th 767 (8th Cir. 2021) in support of his position. *See* Doc. 51, p. 3-5; Doc. 64, p. 2-4.

In *Torres,* police shot at a fleeing suspect's vehicle. Some of the bullets struck her in the back. The suspect managed to escape, steal another vehicle, and drive for several more miles to a hospital. *Torres,* 141 S. Ct. at 994. The Supreme Court held that, despite the suspect's failure to yield to police, she had been seized for Fourth Amendment purposes "the instant the bullets struck her." *Id.* at 999. In reaching its holding, the Supreme Court revisited the common law of arrest it previously discussed in *California v. Hodari D.,* 499 U.S. 621 (1991). *Id.* at 995-97. The Court noted "all the authorities, from the earliest time to the present, establish that a corporal touch is sufficient to constitute an arrest, even though the defendant do[sic] not submit." *See id.* at 996.

The Court drew a distinction between the seizure of a person "by force" and the seizure of a person by "acquisition of control." *Id.* at 1001. The Court noted that, under the common law of arrest, seizure of a person by force requires that there is some physical touching of the defendant's body. *Id.* Seizure of a person by "acquisition of control," involves "either voluntary submission to a show of authority or the termination of freedom of movement through means intentionally applied." *Id.* at 1001-1002. Applying its reasoning from *Hodari* and the common law of arrest, the Court concluded Torres was seized for Fourth Amendment purposes the moment the bullets struck her because police shot at Torres to stop her and the impact of the bullets on her body constituted a corporal touch sufficient to constitute an arrest, even though Torres did not submit. *Id.*

In *Steed v. Missouri State Highway Patrol,* 2 F.4th 767 (8th Cir. 2021), the Eighth Circuit made a glancing reference to *Torres* when deciding whether the use of spike strips by the officers in *Steed* resulted in a seizure under the Fourth Amendment. In *Steed,* Jerome Goode led police on

a twenty-five-mile-high speed chase that ended in his death and the deaths of his passengers including Lavoy Steed. *Id.* at 769. Steed's next friend filed an action under §1983 against the involved officers. Steed's next friend alleged the initial traffic stop that precipitated the chase and the use of spike strips to stop Goode's vehicle were unconstitutional seizures that violated the Fourth Amendment. *Id.* The district court granted summary judgment in favor of the officers finding that the officers had probable cause for the initial stop and the use of spike strips was not a seizure because Goode drove around them. *Id.* at 770.

On appeal, the Eighth Circuit affirmed the district court's ruling. Regarding the use of spike strips, the Eighth Circuit noted that dashcam footage introduced into evidence showed Goode's car did not drive in the left two lanes where the spike strips were placed. *Id.* The court also presumed that because Goode's car continued the chase, Goode did not drive over the spikes because that would have been "likely impossible to do with punctured tires." *Id.* Citing *Torres,* the Eighth Circuit held there was no seizure under the Fourth Amendment because, based on the record, "the officers tried to stop [Goode's Car] with the spike strips—physical force—but were unsuccessful." *Id.*

Williams urges this Court to interpret *Steed* and *Torres* as implicitly holding that the successful use of spike strips constitutes a seizure "by force."  The Court declines to adopt this interpretation for at least two reasons. First, in *Steed* the Eighth Circuit did not squarely address the question presented in this case—namely, did the successful deployment of spike strips, by itself, amount to a "corporal seising" of Williams? This "corporal seising" or physical contact with the body is required under the common law of arrest and required under *Torres*. *Torres*, 141 S. Ct. at 1001.

13

Second, *Torres* suggests that where, as here, physical force is not applied directly to the body of a person, the type of seizure at issue is a seizure by "acquisition of control" and not a seizure "by force." *See Torres,* 141 S. Ct. at 1001-02 (noting the that each type of seizure "enjoys a separate common law pedigree that gives rise to a separate rule" and citing as examples of "seizure by acquisition of control" seizures involving the use of a roadblock, ramming a car off the road, and locking a person in a room). Under a seizure-by-acquisition of control analysis, a person is seized when they voluntarily submit to a show of authority or when they are "stopped by the very instrumentality set in motion or put in place in order to achieve that result." *See id.* at 1001 *(quoting Brower v. County of Inyo,* 489 U.S. 593, 599 (1989) (holding fleeing fugitive who crashed into police roadblock and died was seized under the Fourth Amendment because the roadblock not only intended to stop the driver, but it achieved its intended result).

Here, the evidence of record makes clear that there was no physical contact with Williams' body when the spikes were deployed. The evidence also clearly shows that although police successfully spiked the tires of the Malibu, the spikes did not terminate Williams' freedom of movement. Instead, after the Malibu's tires were spiked and police activated their lights and sirens, Williams led police on a car chase that ended only when Williams crashed the Malibu into another vehicle and then took off running on foot. For the foregoing reasons, Williams was not seized under the Fourth Amendment upon contact between the spikes deployed by police and the Malibu's tires. Instead, Williams was first seized under the Fourth Amendment when he was apprehended, on foot, near the intersection of Lindell Boulevard and Kingshighway.

Although this Court finds that Williams was not seized for Fourth Amendment purposes when the tires of the Malibu were spiked, in the alternative, this Court finds Williams' motion to suppress should be denied even if spiking the tires constituted a seizure. For the reasons set out

14

above, by the time officers spiked the tires of the Malibu, police had reasonable suspicion, if not probable cause, to detain Williams in connection with the shootings being investigated by Detectives Notch and Kelley.

### D. *The gun found in the dumpster is not the fruit of an illegal seizure.*

The factual findings demonstrate that Det. Saito seized the gun Williams seeks to suppress from a dumpster. Det. Saito was chasing Williams, on foot, and saw Williams throw the gun into the dumpster. After Williams was apprehended, Det. Saito went back to the dumpster and retrieved the gun. The warrantless seizure of abandoned property does not violate the Fourth Amendment because individuals who voluntarily abandon property forfeit any expectation of privacy they might have had in that property. *See United States v. Segars*, 31 F.3d 655, 658 (8th Cir. 1994) (citing *Abel v. United States,* 362 U.S. 217, 241 and *United States v. Jones,* 707 F.2d 1169, 1172 (10th Cir. 1983)). "In determining whether property has been abandoned for Fourth Amendment purposes, the court must look to the totality of the circumstances, noting in particular two factors: whether the suspect denied ownership of the property and whether he physically relinquished the property." *United States v. Liu*, 180 F.3d 957, 960 (8th Cir. 1999) (citing *United States v. Landry,* 154 F.3d 897, 899 (8th Cir. 1998)). In addition, "[w]hether an abandonment has occurred is determined on the basis of the objective facts available to the investigating officers, not on the basis of the owner's subjective intent." *Id.* (quoting *United States v. Tugwell,* 125 F.3d 600, 602 (8th Cir. 1997)).

The objective facts available to Detective Saito were that Williams was running, discarded his gun, and kept running. Based on these objective facts available to the officer, Williams clearly abandoned the gun while fleeing from police. A finding that Williams abandoned the gun, however, does not end the inquiry. "To fall outside of Fourth Amendment

15

protection, a defendant's abandonment of evidence cannot be the product of unlawful police conduct." *United States v. Koessel,* 706 F.2d 271, 274 (8th Cir. 1983); *see also Segars*, 31 F.3d at 658 (citing *Koessel,* 706 F.2d at 274). For the reasons set out above, Williams' flight and abandonment of the gun were not the product of unlawful police conduct.

Even before the Strike Team decided to spike the tires of the Malibu and conduct a traffic stop, they had reasonable articulable suspicion to detain Williams for questioning in connection with multiple shootings involving Williams and his younger brother. That suspicion was based on the Strike Team's own observations, information supplied by Detectives Notch and Kelley, who investigated the shootings, and information from the Real Time Crime Center, which provided information further identifying the car Williams was driving during the shootings.

After police activated their lights and sirens, probable cause to detain Williams only grew. "Probable cause to make a warrantless arrest exists when, considering all the circumstances, police have trustworthy information that would lead a prudent person to believe that the suspect has committed or is committing a crime." *United States v. Parish*, 606 F.3d 480, 486 (8th Cir. 2010).  In making this determination, "law enforcement officers have substantial latitude in interpreting and drawing inferences from factual circumstances." *United States v. Henderson*, 613 F.3d 1177, 1181 (8th Cir. 2010) (internal quotation marks and citation omitted). "Because probable cause requires only a probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, the police need not have amassed enough evidence to justify a conviction prior to making a warrantless arrest." *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005) (citation omitted); *see also United States v. Jones*, 535 F.3d 886, 890 (8th Cir. 2008).

The evidence presented at the hearing established that once police activated their lights and sirens, Williams fled, engaging in dangerous, erratic driving that resulted in a car crash at the intersection of Kingshighway and Lindell Boulevard. Williams then led police on a foot chase during which Det. Saito, who knew Williams was a convicted felon, saw Williams thrown a gun into a dumpster.

In sum, the gun found by Det. Saito in the dumpster is not the fruit of an unconstitutional seizure. Williams abandoned the gun by discarding it into the dumpster while unlawfully running away from police. When Williams discarded his gun, he was not seized, and the officers had probable cause to pursue and detain him.

### E.  *Williams' post-arrest statement should not be suppressed.*

Williams has advanced two reasons why statements he made to police should be suppressed. First, Williams argues any statement was the fruit of an illegal arrest. For the reasons previously discussed above, Williams' statement was not the result of an illegal arrest. The officers had reasonable suspicion, if not probable cause, to detain Williams regarding the shootings involving his younger brother. Reasonable suspicion evolved into probable cause to arrest Williams after the officers determined Williams was driving the "wanted" Malibu; Williams led police on a car chase that ended in a car crash; Williams fled on foot from police; and Det. Saito saw Williams—who he knew was a convicted felon—throw a gun into a dumpster and keep running.

Second, Williams asserted in his motion that it was "unclear" he was advised of his *Miranda* rights before being interrogated by police. *See* Doc.  51, ¶26. However, as the factual findings demonstrate, Williams was interviewed by Det. Notch at the police station after his arrest. The hearing testimony of Det. Notch and the video and audio recorded interview

17

introduced into evidence clearly established that Williams was advised of his *Miranda* rights and Williams waived those rights prior to being interviewed by police.

## CONCLUSION

For the foregoing reasons, Defendant's motion to suppress evidence and statements (Doc. No. 51) should be denied.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of October, 2023.

18